**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNILOC 2017 LLC, | § | |
| *Plaintiff,* | § | |
| | § | Case No. 2:18-CV-00503-JRG-RSP |
| v. | § | |
| GOOGLE LLC, | § | |
| | § | |
| *Defendant.* | § | |

**CLAIM CONSTRUCTION**
**MEMORANDUM AND ORDER**

On January 8, 2020, the Court held a hearing to determine the proper construction of the disputed claim terms within United States Patent No. 9,141,489 ("the '489 Patent"). Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (Dkt. Nos. 134, 143, & 146), having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## TABLE OF CONTENTS

I.     BACKGROUND ............................................................................................... 3

II.    APPLICABLE LAW ........................................................................................ 3

III.   THE PARTIES' STIPULATED TERMS ...................................................... 5

IV.    CONSTRUCTION OF DISPUTED TERMS IN THE '489 PATENT ........ 7

    A.   "server" ................................................................................................ 8

    B.   "first server" and "second server" ................................................... 12

    C.   "a second routing device" ................................................................ 16

    D.   "server fingerprint," "fingerprint of the first server," and "fingerprint of the second server" ................................................................................. 18

    E.   "data representing a fingerprint of the first server" ...................... 25

    F.   "status message" and "status signal" ............................................. 27

    G.   "detecting at the routing device an invalid status message from the [first/second] server by absence of the [first/second] server fingerprint in a status message from the [first/second] server" / "invalid status message" .................. 29

V.     CONCLUSION ............................................................................................. 33

## I.     BACKGROUND

Plaintiff Uniloc 2017 LLC ("Plaintiff" or "Uniloc") alleges that Defendant Google LLC ("Defendant" or "Google") infringes United States Patent No. 9,141,489 ("the '489 Patent").

Shortly before the start of the January 8, 2020 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II.     APPLICABLE LAW

This Court's claim construction analysis is guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the Federal Circuit reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312. The starting point in construing such claims is their ordinary and customary meaning, which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13.

However, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. For this reason, the specification is often 'the single best guide to the meaning of a disputed term.'" *Id*. at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–81 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370 (1996)) (internal quotation marks omitted). However, it is the claims, not the specification, which set forth the limits of the patentee's invention. *Id.* at 1312. Thus, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the

patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Other asserted or unasserted claims can also aid in determining a claim's meaning. *See, e.g., Phillips*, 415 F.3d at 1314 (explaining that use of "steel baffles" and "baffles" implied that "baffles" did not inherently refer to objects made of steel).

The prosecution history also plays an important role in claim interpretation as intrinsic evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Id.* at 1317, *see also Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017) (applying this principle in the context of *inter partes* review proceedings); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation"). However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318, *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (noting that ambiguous prosecution history may be "unhelpful as an interpretive resource").

Additionally, courts may rely on extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317. As the Supreme Court recently explained:

> In some cases . . . the district court will need to look beyond the patent's intrinsic evidence . . . to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). However, the Federal Circuit has emphasized that such extrinsic evidence is subordinate to intrinsic evidence. *Phillips*, 415 F.3d at 1317 ("[W]hile extrinsic evidence can shed useful light on the relevant art, we have explained

that it is less significant than the intrinsic record in determining the legally operative meaning of claim language." (internal quotation marks omitted)).

## III.    THE PARTIES' STIPULATED TERMS

The parties agreed to the constructions of the following terms/phrases in their December 26, 2019 P.R. 4-5(d) Joint Claim Construction Chart.

| **Claim Term/Phrase** | **Agreed Construction** |
|---|---|
| "current system configuration of the first server" (Claim 6) | "machine parameters of the first server" |

(Dkt. No. 148-1 at 1).[1] In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

During the claim construction hearing, the parties agreed to the construction of the following terms/phrases:

| **Claim Term/Phrase** | **Agreed Construction** |
|---|---|
| "routing device" (Claims 1–5, 8, 9, 12, 15) | "hardware component that directs traffic" |
| "first application for serving data to multiple clients" (Claim 9) | Plain and ordinary meaning |
| "second application for generating periodic status messages" (Claim 9) | Plain and ordinary meaning |

Regarding the term **"routing device,"** the Court finds that the intrinsic evidence indicates

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF rather than the page numbers assigned in the original document unless otherwise noted.

that the patentee limited the term "routing device" to a "hardware component." During prosecution, the patentee unequivocally required the "routing device" to include a "hardware component." Dkt. No. 143-7 at 12 ("Claim 1 recites various *hardware components* such as 'computer system', '*routing device*' and 'server'. Having passed the machine or transformation test, it is irrelevant to the §101 inquiry whether the invention recites steps that may be implemented in software, because *those steps are tied to a particular machine*.") (emphasis added). This clear disclaimer requires the routing device to include at least a hardware component.

Similarly, the specification indicates that the "routing device" includes a hardware component because it is configured to store "the IP addresses of the active and primary servers." '489 Patent at 8:23–24. Before agreeing to the Court's construction, Plaintiff originally argued that dictionary definitions "make it clear that those of skill in the art understand the term 'router' to include hardware or software." Dkt. No. 157 at 8. However, for the reason discussed above, the extrinsic evidence cited by Plaintiff contradicts the prosecution history.

That said, contrary to Defendant's original argument, the disclaimer does not exclude the "routing device" from also including a software component. Indeed, the specification indicates that a "component" can be "both an application running on a computing device and the computing device can be a component." '489 Patent at 9:11–13. Here, the prosecution history only indicates that the routing device must include at least a hardware component and cannot be purely a software component.

Regarding the phrase **"first application for serving data to multiple clients"** and the phrase **"second application for generating periodic status messages,"** Defendant's original constructions required the application to be "self-contained." This requirement was not only unnecessary, it was also confusing and ambiguous. As Plaintiff correctly argued, applications

interact with other software and hardware components of a computer. Dkt. No. 134 at 28. Nothing in the intrinsic evidence contradicts this understanding. Defendant originally argued that its construction was necessary "because it makes clear that the recited first and second applications are each computer programs and are different from each other." Dkt. No. 143 at 34. Again, the claim language indicates that there is a first application and a second application.

Moreover, the claim language recites that the first application is for "serving data to multiple clients" and that the second application is for "generating periodic status messages." Thus, the claim language is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning. Accordingly, no further construction is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").

## IV. CONSTRUCTION OF DISPUTED TERMS IN THE '489 PATENT

The '489 Patent, titled "Failover Procedure for Server System," issued on September 22, 2015, and bears an earliest priority date of July 9, 2009. The Abstract of the '489 Patent states:

> A failover procedure for a computer system includes steps for routing traffic from a routing device to a first server, storing in the routing device data representing a fingerprint of the first server, receiving periodically at the routing device a status message from the first server, detecting at the routing device an invalid status message from the first server by absence of the fingerprint in a status message from the first server within a predetermined time period after last receiving a valid status message, and routing the traffic from the routing device to a second server in response to detecting the invalid status message from the first server. A redundant server system implementing the failover procedure may include servers each capable of generating its fingerprint by reading current system configuration data.

### A. "server"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "server"<br>(Claims 1–6, 8, 9, 12, 15) | "computer-related entity, either hardware, firmware, a combination of hardware and software, software, or software in execution, that provides services to other components" | "machine or device in a network that is used to provide services to other components in the network" |

Shortly before the start of the January 8, 2020 hearing, the Court provided the parties with the following preliminary construction for this term: "machine or device that includes a hardware component, software component, or data component that provides services to other components."

### 1. The Parties' Positions

The parties dispute whether the term "server" must include a "machine or device" as Defendant proposes or if it can be only software as Plaintiff proposes. Plaintiff argues that the term "server" can refer to a hardware device, a software or firmware device, or a combination thereof. Dkt. No. 134 at 19 (citing '489 Patent at 9:4–7, 9:11–13, 3:40–44). Plaintiff contends that there is nothing in the intrinsic evidence that limits the term "server" to a hardware "machine" or "device." *Id.* at 19–20. Plaintiff further argues that common dictionary definitions confirm that a "server" can be comprised of hardware, software/firmware, or a combination of the two. *Id.* at 20 (citing Dkt. Nos. 134-4, 134-5, 134-6).

Defendant responds that construing "server" as a machine or device is consistent with the specification's use of the term. Dkt. No. 143 at 26 (citing '489 Patent 4:32–44, 5:25–6:16). Defendant also argues that the prosecution history confirms that the claimed server is limited to a machine or device. *Id.* at 27 (citing Dkt. No. 143-7 at 11; Dkt. No. 143-10 at 10–11). Defendant further argues that its construction is also consistent with the understanding of an ordinary skilled artisan at the time of invention. *Id.* (citing Dkt. No. 143-12; Dkt. No. 143-13). Finally, Defendant

contends that Plaintiff improperly seeks to adopt a construction that expands the scope of the claimed server and is inconsistent with the specification and file history. *Id.* at 28.

Plaintiff replies that Defendant's construction of "server" is incorrect because it improperly limits the term to a "machine or device." Dkt. No. 146 at 7. Plaintiff argues that the dictionary definitions it cites confirms that a "server" can be hardware, software, or a combination thereof. *Id.* Plaintiff reasserts that the intrinsic evidence does not limit the term "server" to a hardware "machine" or "device." *Id.* (citing '489 Patent at 3:40–44). Finally, Plaintiff contends that the prosecution history merely acknowledges that the claims encompass hardware servers and does not require the claimed "server" to be limited to hardware servers. *Id.*

### 2. Analysis

The term "server" appears in asserted claims 1–6, 8, 9, 12, and 15 of the '489 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court further finds that the intrinsic evidence indicates that the patentee limited to the term "server" to a machine or device. First, every asserted claim requires a fingerprint of a "server," where the failover process is either triggered by (1) the absence of a server fingerprint in a status message (*see* claim 1); or (2) a mismatch resulting from a comparison between the expected server fingerprint stored in a routing device and the server fingerprint received in the status message (*see* claim 9).

The specification discloses that whenever a server fingerprint is used in the failover procedure, that server fingerprint is derived or generated from hardware parameters of the machine or device. Indeed, the specification states that when "keep-alive signals from the primary or second servers" include a "hardware fingerprint," that fingerprint "is a complex and unique data pattern generated from a stable system configuration of a particular client *machine*" used to "confirm[]

[the] operational status of the originating server." '489 Patent at 4:32–44 (emphasis added).

The specification further states that "[e]ach machine parameter indicates a state or identifier for a hardware component, software component, or data component *of the server*," (*id.* at 4:65–67 (emphasis added)), and that these machine parameters may include things such as the "machine model; machine serial number; machine copyright; machine ROM size, machine UUID, and machine service tag . . . , CPU ID, CPU model, CPU details, CPU actual speed, CPU family, CPU manufacturer; CPU voltage; and CPU external clock . . . ," (*id.* at 5:25–6:16). Likewise, the specification states that "[t]he application may generate the fingerprint data using a process that operates on data indicative of the server's configuration and hardware." *Id.* at 4:58–60. Similarly, the specification states that "a server may comprise a motherboard on which reside a CPU and one or more auxiliary processors." *Id.* at 5:11–12. Thus, the specification indicates that the recited "server" is a machine or device that may include a hardware component, software component, or data component that provides services to other components.

The prosecution history further confirms that the claimed server must include a machine or device. In response to a rejection under 35 U.S.C. § 101, the patentee argued that the claimed invention, and in particular the "server," is constrained to hardware:

> To determine § 101 eligibility for claims 1-8, we need only apply the "machine" part of the machine-or-transformation test to claim 1, and ask: <u>Is the claim tied to a particular machine?</u>
>
> The answer is clearly <u>Yes.</u> Claim 1 recites various hardware components such as "computer system", "routing device" and "server". Having passed the machine or transformation test, it is irrelevant to the § 101 inquiry whether the invention recites steps that may be implemented in software, because those steps are tied to a particular machine.

Dkt. No. 143-7 at 12 (emphasis in original); *see also* Dkt. No. 143-9 at 10–11 (Patentee's appeal brief to the PTO distinguishing *Yoshimura* from the claimed invention because *Yoshimura's* were "virtual servers" that were not "realized in hardware," and were not applicable to "physical

hardware devices as complex as servers.") (emphasis added). As the Federal Circuit has instructed, "[t]he public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003); *see also UShip Intellectual Properties v. U.S.*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("We hold that a patent applicant's response to a restriction requirement may be used to interpret claim terms or as a source of disclaimer."); *North Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1345–46 (Fed. Cir. 2005) (excluding from claim scope certain embodiments based on prosecution history disclaimer).

Plaintiff argues that the term "server" can refer to a hardware device, a software or firmware device, or a combination thereof. Dkt. No. 134 at 19 (citing '489 Patent at 3:40–44). Regarding the prosecution history, Plaintiff contends that it does "merely acknowledge that the claims encompass hardware servers" and that "[n]othing about the cited prosecution history excerpts requires that the claimed 'server' be limited to hardware servers." Dkt. No. 157 at 7. Contrary to Plaintiff's contentions, the intrinsic evidence indicates that the recited "server" is a machine or device that may additionally include a hardware component, software component, or data component that provides services to other components. In summary, the intrinsic evidence indicates that the patentee intended the recited "server" to include at least a physical machine or device. Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and given it its proper weight in light of the intrinsic evidence.

### 3. Court's Construction

For the reasons set forth above, the Court construes the term **"server"** to mean **"machine or device that includes a hardware component, software component, or data component that provides services to other components."**

## B. "first server" and "second server"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "first server" (Claims 1–6, 9, 15) | No separate construction needed from "server"; plain and ordinary meaning | "active server" |
| "second server" (Claims 1, 3, 5, 9, 12, 15) | No separate construction needed from "server"; plain and ordinary meaning | "standby server" |

Shortly before the start of the January 8, 2020 hearing, the Court provided the parties with the following preliminary construction for these terms: Plain and ordinary meaning.

### 1. The Parties' Positions

The parties dispute whether the terms "first server" and "second server" require construction. Plaintiff argues that the word "first" and "second" are used to distinguish the "first server" from the "second server." Dkt. No. 134 at 20. According to Plaintiff, this is a common claiming technique, and nothing more should be read into the use of the word "first." *Id.* Plaintiff argues that Defendant's construction improperly attempts to import limitations from the specification into the claims by construing the term "first server" to mean "active server" and by construing the term "second server" to mean "standby server." *Id.* Plaintiff contends that Defendant's constructions are less clear than the claim language as written. *Id.*

Defendant responds that the specification ascribes a particular purpose for the distinction that is not captured in the plain and ordinary meaning. Dkt. No. 143 at 29. Defendant argues that the specification explains that the first server is the active server that receives traffic from the routing device, while the second server remains idle in a standby role without receiving any traffic until and unless the first or active server fails. *Id.* (citing '489 Patent at 1:56–2:8, 2:19–28, 3:36–40, 3:51–52, 4:9–11, Figures. 1, 2, & 4). Defendant also argues that designating the first and

second servers as active and stand-by servers is precisely how the patentee summarized his invention during prosecution. *Id.* (citing Dkt. No. 143-9).

Plaintiff replies that the plain meaning of "first" and "second" will be readily understood by the jurors. Dkt. No. 146 at 7. Plaintiff further argues that there is no legitimate reason for substituting "active" and "standby" for those terms. *Id.* According to Plaintiff, the plain and ordinary meaning of the word "first" and "second" should be adopted here. *Id.*

### 2. Analysis

The term "first server" appears in asserted claims 1–6, 9, 15 of the '489 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term "second server" appears in asserted claims 1, 3, 5, 9, 12, and 15 of the '489 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court further finds that both terms should be given their plain and ordinary meaning.

The claim language uses the words "first" and "second" to distinguish the "first server" from the "second server." The claim language further recites the role of each server in the claimed method or system. For example, claim 1 generally recites that traffic is routed to the first server until an invalid status message is detected and that, in response to that detection, further traffic is routed to the second server. Likewise, claim 9 generally recites that traffic is routed to the primary server, *which is either the first or second server*, until a mismatch in the fingerprint causes the system to change the primary server to the other of the first or second server. Accordingly, given that the Court has construed the term "server," there is no reason to further construe the clear and unambiguous terms "first" and "second."

Indeed, Defendant's construction would appear to contradict the claim language of claim

9 by requiring the "second server" to always be the "standby server." Claim 9 recites that the traffic is routed to *a primary server* of the first and second servers." Thus, claim 9 allows either the first server or the second server to be the "primary server" and does not require the "second server" to be the "standby server" as Defendant proposes. Likewise, dependent claim 3 recites "routing the traffic from the routing device to the first server in response to detecting the invalid status message from the second server." Similar to claim 9, claim 3 does not require the "second server" to be the "standby server."

Defendant argues that "[t]here is no dispute that the words 'first' and 'second' are intended to distinguish among different servers." Dkt. No. 143 at 28. Defendant contends that a construction is required because "the patent ascribes a particular purpose for that distinction that is not captured in the plain and ordinary meaning that Plaintiff is endorsing." *Id.* at 29. The Court agrees that the intrinsic evidence establishes a distinction between the first and second server. *See, e.g.*, '489 Patent at 3: 36–40 ("FIG. 1 shows a single-server deployment system 100, comprising a first server 102 and a second server 104, in an operational state where server 102 is the designated active or primary server and server 104 is the standby or secondary server."); *see also id.* at 1:56–2:8 ("The present technology provides for automatic failover in systems having at least one primary (active) and at least one secondary (stand-by) server . . . ."); 2:19–28 ("In response to detecting failure of the primary server, each routing appliance switches all traffic to the secondary server which assumes the role of the primary server."); Figure 1 (items 102 and 104); Figure 2 (items 202, 206); Figure 4 (items 402 ("configure active and standby servers"), 410 ("monitor status of active server")); 3:36–40 (". . . a first server 102 and a second server 104, in an operational state where server 102 is designated active or primary server and server 104 is the standby or secondary server."); 3:51–52 (referring to first server 102 as the "active server 102"); 4:9–11 (referring to

second server 104 as the "standby server 104").

However, the distinction between the first server and the second server is captured in the claim language. Indeed, in support of its argument, Defendant quotes the claim language itself. Dkt. No. 143 at 29 (quoting claim 1). Accordingly, the Court rejects Defendant's construction because it has failed to provide a persuasive reason to redraft the claims as it proposes.

At the January 8, 2020 hearing, Defendant agreed that the dispute centered on its construction for the term "second server" and its understanding of the term "standby." Specifically, Defendant argued that "standby" meant that the "second server" cannot do anything but mirror the first server and only the first server. The Court agrees that the intrinsic evidence indicates that the standby server mirrors the active server. Dkt. No.143-9 at 5. However, there is no requirement that the standby server is limited to mirroring only the active server. Indeed, the claims use the open-ended transitional phrase "comprising." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.").

Moreover, the claim language explicitly recites the respective roles of the "first server" and the "second server" and how the roles may change when an event occurs. As discussed above, Defendant's construction would contradict the plain claim language when a change in roles is required. Accordingly, having resolved the parties' dispute, the Court finds that no further construction is necessary. *See Ethicon,* 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro,* 521 F.3d at 1362 ("[D]istrict courts are

not (and should not be) required to construe every limitation present in a patent's asserted claims."). Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and given it its proper weight in light of the intrinsic evidence.

### 3. Court's Construction

For the reasons set forth above, the terms **"first server"** and **"second server"** are given their **plain and ordinary meaning.**

### C. "a second routing device"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "a second routing device"<br><br>(Claim 15) | Plain and ordinary meaning | a "routing device" that is separate and distinct from a first "routing device" |

Shortly before the start of the January 8, 2020 hearing, the Court provided the parties with the following preliminary construction for this term: Plain and ordinary meaning.

### 1. The Parties' Positions

The parties dispute whether the second routing device must be "separate and distinct" from the first routing device, as Defendant proposes. Plaintiff argues that the word "second" is used to distinguish the "routing device" from the "second routing device." Dkt. No. 134 at 22. According to Plaintiff, this is a common claiming technique and nothing more should be read into the use of the word "second." *Id.* Plaintiff argues that Defendant's construction improperly attempts to import limitations into the claims by requiring that the two routing devices be "separate and distinct." *Id.* at 22–23. Plaintiff contends that Defendant's constructions are less clear than the claim language as written. *Id.* at 23.

Defendant responds that claim 15 adds a "second" routing device to the system of claim 9, which already recites a first routing device. Dkt. No. 143 at 32. Defendant argues that it is a basic

tenet of claim construction that "[w]here a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Id.* (citing *Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, LP, 616 F.3d 1249, 1254 (Fed. Cir. 2010)). According to Defendant, the specification consistently describes two or more routing appliances or devices as separate and distinct from each other. *Id.* (citing '489 Patent at 3:55–4:2; Figure 1 (items 114 ("Appliance 01"), 116 ("Appliance 02")); Figure 2 (items 210, 212), Figure 3 (items 310, 312)).

Plaintiff replies that Defendant's construction improperly attempts to import limitations into the claims by requiring that the two routing devices be "separate and distinct." Dkt. No. 146 at 8. Plaintiff contends that Defendant's constructions are less clear than the claim language as written. *Id.*

### 2. Analysis

The term "a second routing device" appears in asserted claim 15 of the '489 Patent. The Court finds that the term is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning. The Court has construed the term "routing device," which only leaves the term "second" to be construed. The construction for "routing device" is "hardware component that directs traffic." In this context, the term "second" will distinguish the first "hardware component that directs traffic" from the "second hardware component that directs traffic." Accordingly, the term "second" will be given its plain and ordinary meaning.

Defendant argues that the "second routing device" must be "separate and distinct" from the first "routing device." However, the parties' claim construction dispute is resolved by the Court's construction for the term "routing device." The Court construed "routing device" to mean "hardware component that directs traffic," so dependent claim 15 requires a "second hardware

component that directs traffic." In other words, claim 15 requires two hardware components, which "logically cannot be one and the same." *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1404–05 (Fed. Cir. 1996).

### 3. Court's Construction

For the reasons set forth above, the term **"a second routing device"** is given its **plain and ordinary meaning.**

### D. "server fingerprint," "fingerprint of the first server," and "fingerprint of the second server"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "server fingerprint" (Claim 3, 9, 15) | "data that can be used to determine validity of a status message from the first server" | "machine fingerprint that comprises binary data generated from a plurality of user-configurable and non- user-configurable machine parameters that is reliably reproducible by an application operating on the server, while being virtually irreproducible by any other means, and virtually impossible to guess using any systematic or brute force algorithm, that uniquely identifies the server" |
| "fingerprint of the first server" (Claim 1, 3) | "data that can be used to determine validity of a status message from the first server" | "server fingerprint" of the first server |
| "fingerprint of the second server" (Claim 1, 3) | "data that can be used to determine validity of a status message from the second server" | "server fingerprint" of the second server |

Shortly before the start of the January 8, 2020 hearing, the Court provided the parties with the following preliminary constructions for these phrases:

| Disputed Term | Court's Preliminary Construction |
|---|---|
| "server fingerprint" | "data that is reliably reproducible by an application operating on a particular client machine, while being virtually irreproducible by any other means, and virtually impossible to guess using any systematic or brute force algorithm. In short, each fingerprint is a complex and unique data pattern generated from a stable system configuration of a particular client machine" |
| "fingerprint of the first server" | "'server fingerprint' of the first server" |
| "fingerprint of the second server" | "'server fingerprint' of the second server" |

### 1. The Parties' Positions

The parties dispute whether the patentee limited the scope of the term "server fingerprint" during prosecution. Plaintiff argues that neither party appears to dispute that the fingerprint corresponds to "the [first server/second server]." Dkt. No. 134 at 23. Plaintiff further argues that the purpose of the fingerprint is to provide data that is highly likely to only be associated with one server in a system so that when that fingerprint is received, the recipient can determine that the status message including the fingerprint is valid and that the server is operational. *Id.* at 23. According to Plaintiff, the specification is clear that user-configurable parameters or non-user-configurable parameters can be used alternatively or that both can be used together. *Id.* at 24 (citing '489 Patent at 4:14–16, 4:32–34, 4:60–64, 5:9–11, 8:47–62, 10:3–16, 10:46–51).

Regarding Defendant's construction, Plaintiff argues that it is inconsistent with the specification because it requires the use of both user-configurable and non-user-configurable parameters. *Id.* at 24. Plaintiff contends that the specification leaves open the possibility of the fingerprint being generated as something other than "binary data." *Id.* Plaintiff further argues that the specification does not require that the fingerprint be 100% unique. *Id.*

Defendant responds that a "server fingerprint" comprises binary data generated from a

plurality of user-configurable and non-user-configurable machine parameters server. Dkt. No. 143 at 20 (citing '489 Patent at 4:58–64, 5:25–32, 5:33–6:5). Defendant also argues that a "server fingerprint" is reliably reproducible by the server, virtually irreproducible by any other means, and virtually impossible to guess. *Id.* (citing '489 Patent at 4:34–39). Defendant further argues that a "'server fingerprint' uniquely identifies the server." *Id.* (citing '489 Patent at 4:39–41, 4:67–5:11). Defendant also contends that the prosecution history confirms its construction. *Id.* at 21. According to Defendant, the patentee defined "server fingerprint" consistent with Defendant's construction. *Id.* (citing Dkt. No. 143-6; Dkt. No. 143-7; Dkt. No. 143-8; Dkt. No. 143-9). Finally, Defendant argues that the Patent Office also defined "server fingerprint" consistent with Defendant's construction. *Id.* (citing Dkt. No. 143-10; '489 Patent at 4:32–51; Dkt. No. 143-11).

Plaintiff replies that if there are alternative definitions in the specification and prosecution history, then this means that the patentee did not explicitly define the term "server fingerprint." Dkt. No. 146 at 8. Plaintiff argues that Defendant incorrectly contends that "server fingerprint" has to include the substance of all of those "definitions." *Id.* at 9. Plaintiff further contends that Defendant is trying to improperly narrow the construction by importing as many limitations as possible into the construction of the term "server fingerprint." *Id.*

### 2. Analysis

The term "server fingerprint" appears in asserted claims 3, 9, and 15 of the '489 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term "fingerprint of the first server" appears in asserted claims 1 and 3 of the '489 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term "fingerprint of the second server" appears in asserted claims 1 and 3 of the '489 Patent. The Court finds that the term is used

consistently in the claims and is intended to have the same general meaning in each claim.

The Court further finds that the intrinsic evidence provides an explicit definition for the term "server fingerprint." Specifically, the specification states the following:

> *As used herein, a hardware fingerprint is* data characterized by being reliably reproducible by an application operating on a particular client machine, while being virtually irreproducible by any other means, and virtually impossible to guess using any systematic or brute force algorithm. In short, *each fingerprint is* a complex and unique data pattern generated from a stable system configuration of a particular client machine.

'489 Patent at 4:34–41 (emphasis added). The prosecution history further confirms this definition. In a decision dated June 22, 2015, the PTAB determined that it could not sustain the Examiner's rejections based on *Yoshimura*. The PTAB explained that "*Appellants define 'fingerprint'* (Spec. ¶ 21 ('a hardware fingerprint is data characterized by being reliably reproducible by an application operating on a particular client machine, while being virtually irreproducible by any other means, and virtually impossible to guess using any systematic or brute force algorithm.')" and held that there was no basis for the Examiner's rejection "*in view of this definition of a fingerprint.*" Dkt. No. 143-10 at 6 (emphasis added).

On June 26, 2015, the Examiner issued a notice of allowance, echoing the PTAB's explanation regarding the Applicant's definition of a fingerprint:

> "fingerprint" is defined in the specification in ¶ 21 [i.e., '489 Patent, col. 4:32–51]: "<u>As used herein, a hardware fingerprint is data characterized by being reliably reproducible by an application operating on a particular client machine, while being virtually irreproducible by any other means, and virtually impossible to guess using any systematic or brute force algorithm. In short, each fingerprint is a complex and unique data pattern generated from a stable system configuration of a particular client machine.</u>"

143-11 at 7 (emphasis in original). The examiner emphasized that his reason for allowance was based on the patentee's definition of "fingerprint." *Id.* ("In summary, the Board determine[d] that the data defined by the 'fingerprint' as defined by 'hardware fingerprint' (of Applicant's ¶ 21) is

not analogous to the checksum of Yoshimura.").

An examiner's reason for allowance can carry significant weight in a claim construction analysis because it is evidence of how one of skill in the art understood the term at the time the application was filed. *See Arendi S.A.R.L. v. Google LLC*, 882 F.3d 1132, 1136 (Fed. Cir. 2018) ("[T]he examiner's Reasons for Allowance made 'clear that the examiner and the applicant understood' . . . what the invention required."). Accordingly, the Court adopts the explicit definition provided in the intrinsic evidence.

Turning to Defendant's construction, the Court rejects the proposed language of "comprises binary data generated from a plurality of user-configurable and non- user-configurable machine parameters." Defendant argues that the specification explains that a fingerprint application running on the server "*may* generate the fingerprint data using a process that operates on data indicative of the server's configuration and hardware. The fingerprint data *may* be generated using user-configurable machine parameters, non-user-configurable machine parameters, or both as input to a process that generates a fingerprint data file as binary data." '489 Patent at 4:58–64 (emphasis added). The specification further states that "[t]o generate the fingerprint, a fingerprint application operating on the server *may* perform a system scan to determine a present configuration of the computing device" and that "[t]he application *may* then select the machine parameters to be used as input for generating the unique fingerprint data." *Id.* (emphasis added). As indicated, the specification uses permissive language in describing the fingerprint, which indicates that these are embodiments that should not be read into the claims.

Defendant argues that the prosecution history confirms a clear intent to require that a "server fingerprint" have the language that it proposes. Dkt. No. 143 at 21. Specifically, in the Office Action dated October 14, 2011, the Examiner rejected then-pending claims based on US

2003/0163734 to Yoshimura et al. ("Yoshimura"), which the Examiner argued disclosed "[s]toring in the routing device data representing a fingerprint of the first server" and "[d]etecting at the routing device an invalid status message from the first server by absence of the fingerprint in a status message from the first server." Dkt. No. 143-6 at 5–6. The Examiner contended that checksums disclosed by Yoshimura read on the "fingerprint" recited in the claims. *Id.*

In an Amendment dated January 17, 2012, the patentee responded to the rejection by arguing that *Yoshimura* failed to disclose the "server fingerprint" recited in the claims and that the other prior art references failed to cure that deficiency in *Yoshimura*. Dkt. No. 143-7 at 12–17. The patentee further argued that "[t]he Office Action is confusing checksums with server fingerprints. One skilled in the art would understand that a checksum of an OS environment doesn't satisfy the definition of a fingerprint, as those terms are *defined in the specification* and in dictionaries of computer terms." *Id.* at 13 (emphasis added). Defendant argues that, in making these argument, the patentee did not state that a server fingerprint "may be" a machine fingerprint comprising binary data generated from user configurable and non-user-configurable machine parameters. According to Defendant, the patentee's use of "is" clearly and unmistakably confirms that these are requirements of a "server fingerprint." Dkt. No. 143 at 23 (citing Dkt. No. 143-7 at 13).

The Court disagrees that this portion of the prosecution history is a clear disclaimer. First, the patentee argued that the term "fingerprint" is "defined in the specification." Dkt. No. 143-7 at 13. As discussed above, the Court's construction is the explicit definition provided in the specification and confirmed in the prosecution history. The Court is not persuaded that the patentee's discussion of other embodiments of the "fingerprint" eliminates the alternative language in this instance.

Indeed, while all of the features discussed "*may*" be included, as indicated in the

specification, they were not necessary to distinguish the prior art. This was indicated by the examiner in the Notice of Allowance, which relied exclusively on the explicit definition provided in the specification. Dkt. No. 143-11 at 7. Accordingly, the Court rejects this portion of Defendant's construction.

Regarding Defendant's "uniquely identifies the server" language, the Court's construction includes this aspect of the fingerprint data. The second sentence in the Court's construction states that data is "a complex and unique data pattern generated from a stable system configuration of a particular client machine." This is the explicit definition provided in the specification.

Turning to Plaintiff's construction, the Court rejects it because it is not consistent with the intrinsic evidence. First, it ignores the intrinsic evidence and attempts to replace the explicit definition provided by the patentee with "data that can be used to determine validity of a status message from the first server." As discussed, the recited "fingerprint" is more than data that can be used to determine validity status.

Plaintiff also argues that Defendant's construction incorrectly requires the fingerprint to "uniquely identif[y] the server." Dkt. No. 134 at 24. According to Plaintiff, the specification is clear that "the resulting fingerprint data has a very high probability (e.g., greater than 99.999%) of being unique to the server," but Plaintiff contends that this does not require that the fingerprint be 100% unique. *Id.* (citing '489 Patent at 5:1–4). Contrary to Plaintiff's argument, a person of ordinary skill in the art would understand that having a greater than 99.999% probability would be considered a unique identifier, even if there is "some possibility that the fingerprint may not be 100% unique to the server." *Id.* More importantly, within the prosecution history, the patentee contrasted "the server fingerprint uniquely identifies the server itself" against the prior art checksum that did not identify the server. Dkt. No. 143-7 at 14.

Accordingly, the Court rejects Plaintiff's construction—the Court's construction will instead adopt the definition provided in the specification, which provides that the fingerprint is "a complex and unique data pattern generated from a stable system configuration of a particular client machine."

Regarding the terms "fingerprint of the first server" and "fingerprint of the second server," the parties agree that the Court's construction for the term "fingerprint" will resolve the parties' dispute and that no construction is required. Dkt. 143 at 20–21; Dkt. No. 157 at 8.

### 3. Court's Construction

For the reasons set forth above, the Court construes the term **"server fingerprint"** to mean **"data that is reliably reproducible by an application operating on a particular client machine, while being virtually irreproducible by any other means, and virtually impossible to guess using any systematic or brute force algorithm. In short, each fingerprint is a complex and unique data pattern generated from a stable system configuration of a particular client machine."** The Court further construes the term **"fingerprint of the first server"** to mean **"'server fingerprint' of the first server"** and the term **"fingerprint of the second server"** to mean **"'server fingerprint of the second server."**

### E. "data representing a fingerprint of the first server"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "data representing a fingerprint of the first server" (Claim 1) | "data that can be used to determine validity of a status message from the first server" | "data amounting to a fingerprint of the first server" |

Shortly before the start of the January 8, 2020 hearing, the Court provided the parties with the following preliminary construction for this term: "fingerprint of the first server."

### 1. The Parties' Positions

The parties dispute whether the term "data representing" should be construed to mean "data amounting," as Defendant proposes. Plaintiff argues that its construction is the same construction it proposed for "server fingerprint" because the server fingerprint is represented by a data file. Dkt. No. 134 at 25 ('489 Patent 4:39–41, 4:60–64). Plaintiff argues that Defendant's proposed construction is vague as to what it means to be data "amounting to" a fingerprint. *Id.* at 25.

Defendant responds that the specification does not describe any data separate from the fingerprint itself that can "represent" a fingerprint of the first server. Dkt. No. 143 at 25. According to Defendant, the claim requirement that "data representing a fingerprint of the first server" be stored in the routing device requires that the routing device store the fingerprint itself. *Id.*

### 2. Analysis

The term "data representing a fingerprint of the first server" appears in asserted claim 1 of the '489 Patent. The dispute for this term is the same as the previous term "fingerprint," with the addition of the words "data representing." Plaintiff argues that Defendant's construction is vague as to what it means to be data "amounting to" a fingerprint. Dkt. No. 134 at 25. The Court agrees that Defendant's construction is confusing and unnecessary. Moreover, the parties essentially agree that "data representing a fingerprint of the first server" is the "fingerprint of the first server." Indeed, Defendant argues that the claim requirement that "data representing a fingerprint of the first server" be stored in the routing device requires that the routing device store the fingerprint itself. Dkt. No. 143 at 25. Similarly, Plaintiff proposes the same construction for this phrase as it does for the term "server fingerprint." Accordingly, the Court construes "data representing a fingerprint of the first server" to mean "fingerprint of the first server."

### 3. Court's Construction

For the reasons set forth above, the Court construes the phrase **"data representing a fingerprint of the first server"** to mean **"fingerprint of the first server."**

### F. "status message" and "status signal"

| **Disputed Term** | **Plaintiff's Proposal** | **Defendant's Proposal** |
|---|---|---|
| "status message" (Claim 1–4, 8, 9, 12, 15) | "message that indicates the state of the sender" | "heartbeat or keep-alive message containing a data structure reserved for a server fingerprint" |
| "status signal" (Claim 4) | "status message" (typographical error) | "heartbeat or keep-alive signal containing a data structure reserved for a server fingerprint" |

Shortly before the start of the January 8, 2020 hearing, the Court provided the parties with the following preliminary construction for these terms: "message that indicates the operational status of an originating server."

### 1. The Parties' Positions

The parties dispute whether the term "status message" must contain a "data structure reserved for a server fingerprint" as Defendant proposes. The parties agree that "status signal" means "status message." Plaintiff argues that the "status message" indicates to the recipient that state (e.g., failure or no failure) of the sender. Dkt. No. 134 at 25 (citing '489 Patent at 4:20–27, 4:27–31). Regarding Defendant's construction, Plaintiff argues that the specification never states that the status message or keep-alive signal includes a "data structure." *Id.* Plaintiff contends that the only time the term "data structure" is used in the specification is to refer to data structures that are stored on computer readable media from which components such as a processor or program can execute. *Id.* (citing '489 Patent at 9:16–18).

Defendant responds that claim 1 and claim 9 indicate that a status message (or status signal)

must be capable of containing a server fingerprint (i.e., must contain a data structure reserved for a fingerprint). Dkt. No. 143 at 33. Defendant argues that this is consistent with the specification, which confirms that a status message may also contain data structures reserved for other types of data, such as a header or a time stamp. *Id.* (citing '489 Patent at 4:41–51). Defendant contends that Plaintiff's construction ignores the composition of the message or signal and informs only its utility. *Id.*

Plaintiff replies that the portion of the specification cited by Defendant confirms that the fingerprint may (but is not required) to be included in the "status message." Dkt. No. 146 at 9 (citing '489 Patent at 4:47–49). Plaintiff contends that the specification is permissive and does not require inclusion of the fingerprint. *Id.* According to Plaintiff, Defendant's construction is inconsistent with the specification. *Id.*

### 2. Analysis

The term "status message" appears in asserted claims 1–4, 8, 9, 12, and 15 of the '489 Patent. The term "status signal" appears in asserted claim 4 of the '489 Patent. The Court finds that the terms are used consistently in the claims and are intended to have the same general meaning in each claim. The Court further finds that the term "status message" should be construed to mean "message that confirms operational status of an originating server." In the same portion of the specification that defines the term "fingerprint," the specification states that the "fingerprinted status message confirms operational status of the originating server." '489 Patent at 4:43–44. The parties' construction are similar on this point.

Plaintiff proposes construing the term to mean "message that indicates the state of the sender." Similarly, Defendant proposes construing the term to mean "heartbeat or keep-alive message." Both of these constructions indicate that the status message is a "message that confirms

operational status of an originating server." Accordingly, the Court adopts the words chosen by the patentee in the specification and construes the terms "status message" and "status signal" to mean "message that confirms operational status of an originating server."

Regarding Defendant's proposed language of "containing a data structure reserved for a server fingerprint," the specification states that "[e]ach message *may* consist of or comprise a brief header, time stamp, and machine fingerprint." '498 Patent at 4:47–49 (emphasis added). As indicated, this is permissive language. Moreover, it is the claim language itself that requires a "fingerprint in a status message" (claim 1) or that "each status message includ[es] a server fingerprint" (claim 9). Accordingly, Defendant's construction is redundant at best and would only confuse the jury.

### 3. Court's Construction

For the reasons set forth above, the Court construes the terms **"status message"** and **"status signal"** to mean **"message that confirms operational status of an originating server."**

### G. "detecting at the routing device an invalid status message from the [first/second] server by absence of the [first/second] server fingerprint in a status message from the [first/second] server" / "invalid status message"

| **Disputed Term** | **Plaintiff's Proposal** | **Defendant's Proposal** |
|---|---|---|
| "detecting at the routing device an invalid status message from the first server by absence of the fingerprint in a status message from the first server"<br><br>(Claim 1) | Plain and ordinary meaning | "determining, at the routing device, that a failure has occurred because the fingerprint that is expected in the status message from the first server is missing" |

| __Disputed Term__ | __Plaintiff's Proposal__ | __Defendant's Proposal__ |
|---|---|---|
| "detecting at the routing device an invalid status message from the second server by absence of the second server fingerprint in a status message from the second server"<br><br>(Claim 3) | Plain and ordinary meaning | "determining, at the routing device, that a failure has occurred because the fingerprint that is expected in the status message from the second server is missing" |
| "invalid status message"<br><br>(Claim 1, 3, 4) | Plain and ordinary meaning | "status message indicating a failure" |

Shortly before the start of the January 8, 2020 hearing, the Court provided the parties with the following preliminary construction for these phrase/terms: Plain and ordinary meaning.

### 1. The Parties' Positions

The parties dispute whether the term "invalid status message" requires construction. The parties also dispute whether the longer phrases that include this term require construction. Plaintiff argues that Defendant's construction replaces the word "detecting" with the word "determining." Dkt. No. 134 at 26. Plaintiff further argues that Defendant's construction also replaces "determining . . . an invalid status message" with "determining . . . that a failure has occurred." *Id.* According to Plaintiff, "determining . . ." implies computerized actions in which a failure condition is affirmatively determined by processing the received data. *Id.* at 26–27. Plaintiff contends that one of the ways a failure is detected is by the absence of the server fingerprint. *Id.* at 27 (citing '489 Patent at 8:53–56).

Defendant responds that the routing device must affirmatively detect a status message and determine that it is invalid prior to performing a failover procedure. Dkt. No. 143 at 34. Defendant contends that claim 1 is not directed to a process in which a routing device does not detect any status message but nonetheless performs a failover procedure. *Id.* Defendant argues that its

construction is necessary to make clear that the claims require that the routing device detect an invalid status message whereby an expected fingerprint is missing from that message before performing a failover procedure. *Id.*

Plaintiff replies that Defendant's construction requires that the status message have a data value that is equated with a failure. Dkt. No. 146 at 10. Plaintiff contends that no affirmative indication of a failure is required by the specification. *Id.* (citing '489 Patent at 8:53–56). Plaintiff further argues that Defendant's construction replaces the word "detecting" with the word "determining." *Id.* According to Plaintiff, "determining . . ." implies computerized actions in which a failure condition is affirmatively determined by processing the received data. *Id.* Plaintiff contends that a failure can be detected by the absence of the server fingerprint. *Id.* (citing '489 Patent at 8:53–56).

### 2. Analysis

The phrase "detecting at the routing device an invalid status message from the first server by absence of the fingerprint in a status message from the first server" appears in asserted claim 1 of the '489 Patent. The phrase "detecting at the routing device an invalid status message from the second server by absence of the second server fingerprint in a status message from the second server" appears in asserted claim 3 of the '489 Patent. The term "invalid status message" appears in asserted claims 1, 3, and 4 of the '489 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

The Court further finds that the terms "invalid status message" and "detecting" should be given their plain and ordinary meaning. Defendant argues that the claims recite "detecting at the routing device an invalid status message" from a server and also recite routing traffic to another server "in response to detecting the invalid status message." Dkt. No. 143 at 33. According to

Defendant, this means that "the routing device *must affirmatively detect* a status message *and determine* that it is invalid (i.e., the fingerprint that is expected in the status message from the server is missing), prior to performing a failover procedure (i.e., routing traffic to another server)." *Id.* at 34 (emphasis added). As Defendant's argument plainly illustrates, Defendant seeks to redraft the term "detecting" to mean "detecting *and* determining." Defendant has not provided a persuasive reason to do so.

Defendant argues that the construction is necessary "to make clear that the claims require that the routing device detect an invalid status message whereby an expected fingerprint is missing from that message before performing a failover procedure." *Id.* The plain claim language clearly recites this without the need for further ambiguity. For example, claims 1 and 3 recite that it is after the "detecting" step that the traffic is routed to a second server. Likewise, claims 1 and 3 recite that a "status message" is an "invalid status message" when a fingerprint is absent from the status message. Accordingly, no further construction is necessary. *See Ethicon*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").

During the January 8, 2020 hearing, Defendant argued that an affirmative determination must be included in the construction to exclude from the scope of the claim the situation where no status message is sent. The Court notes that the claim 1 recites "receiving periodically at the routing device a status message from the first server." If a status message is not received, then this element of the claim would not be met.

### 3. Court's Construction

For the reasons set forth above, the phrase **"detecting at the routing device an invalid status message from the first server by absence of the fingerprint in a status message from the first server;"** the phrase **"detecting at the routing device an invalid status message from the second server by absence of the second server fingerprint in a status message from the second server;"** and the term **"invalid status message"** will each be given their **plain and ordinary meaning**.

## V.  CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered to not refer to each other's claim construction positions in the presence of the jury. Likewise, in the presence of the jury, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court. The Court's reasoning in this order binds the testimony of any witnesses, and any reference to the claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 30th day of January, 2020.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE